## CHESHIRE, MAY TERM, 1826.

~~~~

### CALEB COBURN *vs.* SAMUEL PICKERING.

Any trust attending a sale of chattels is a fraud with respect to creditors.
And if the vendor of chattels retain possession after an absolute sale, this is always,
  *prima facie*, and if unexplained, conclusive, evidence of a secret trust.
And it will not be deemed a satisfactory explanation to shew, that the sale was at
  first without any trust, but the goods were left with the vendor under a subsequent
  contract, that he should retain possession and pay rent for the use of the goods.
When the question is, whether there was a trust, it is a question of fact, to be deci-
  ded by a jury; but when the trust is admitted or proved, the fraud is an inference
  of law, which the court is bound to pronounce.

Trespass *de bonis asportatis.* The cause was tried here,
upon the general issue, at October term, 1825; when it ap-
peared in evidence, that on the 20th August, 1823, one *Oliver
Sampson*, being the lawful owner of the goods mentioned in
the declaration, and being indebted to one *Delano*, his brother
in law, in a sum exceeding the value of the goods, sold the
same to *Delano* to pay the said debt in part. *Sampson*, at
the time of the sale, was an inn-keeper; and after the sale,
but before the goods were removed, it was agreed between
*Sampson* and *Delano*, that the goods, which were household
furniture, should be left and used in the tavern. But, in
order to secure them from being taken by other creditors of
*Sampson*, who was insolvent, *Delano* made a lease of the
goods to the plaintiff, who was an hired man, then in the em-
ployment of *Sampson*, for six months. It was agreed, that
this arrangement was made merely for the purpose of giving
to *Sampson* and his family the use of the goods.

There was no direct evidence, shewing, that this arrange-
ment made any part of the original contract, between *Delano*
and *Sampson*, for the sale of the goods; and *Sampson*, who
was admitted as a witness, testified, that the agreement to
leave the goods made no part of the contract of sale, but
was an arrangement entered into altogether subsequently to
the sale. It further appeared, that the goods were delivered
to *Coburn*, and left in the house, where they were used by
*Sampson* and his family, as before, until the 26th August,
1823, when they were attached by the defendant, a deputy
sheriff, by virtue of a writ against *Sampson*.

The court being of opinion, that the lease of the goods to *Coburn* was, under the circumstances, only a lease of the same, in fact, to *Sampson*, and that, although the leaving of the goods with *Sampson* might not have been originally contemplated, when the contract of sale was first made; yet, as that arrangement was adopted before the goods were removed, the whole must be considered as one transaction and one contract, and that the leaving of the goods in *Sampson's* possession was, under the circumstances, conclusive evidence of a secret trust, directed a verdict to be taken for the defendant, subject to the opinion of the court upon the above case.

*Handerson,* for the plaintiff.

The first question is, is the fact of the vendor of goods remaining in possession, after an absolute sale, conclusive evidence of fraud, or fraud *per se,* or is it only evidence, from which the jury may or may not, connected with other circumstances, find the transaction fraudulent? The first case to be found is *Twyne's.* The court do not lay great stress upon the fact of the vendor's remaining in possession; but it is, that he exercised decided acts of ownership, by selling some of the sheep, marking others with his mark, &c. I find nothing in that case to warrant the doctrine, that fraud is a question of law, or that possession is conclusive evidence of fraud.

The case of *Cadogan vs. Kennet,* (*Cowper* 432,) was a suit by trustees under a marriage settlement. The goods had always remained in the possession of the debtor, and were taken as his. The court, in giving judgment, say, among other things, "the statutes of frauds, (13 *Eliz. C.* 5, and 27 " *Eliz. C.* 4,) say not a word about possession, but the law " says, if after a sale of goods the vendor continues in pos- " session and appears as visible owner, it *is evidence of fraud—* " not *conclusive evidence.*" In *Haselinton vs. Gill,* (3 *D. & E.* 620, *note,*) a case similar to *Cadogan vs. Kennet,* the court say, " it has been frequently determined, that possession, " alone, is not evidence of fraud; the transaction must be " shown to be fraudulent from the circumstances; if the " possession be inconsistent with the conveyance, that is evi-

" dence of fraud."  But it is not said to be conclusive evidence of fraud.  *Dewy vs. Boynton*, (6 *East* 257,) is similar to the case last mentioned.

In the case of *Kidd vs. Rawlinson*, (2 *B.& P.*59,) the plaintiff bought the goods at a sheriff's sale, and left them with the debtor, who sold them to the defendant ; yet the sale to the plaintiff was held good ; notwithstanding the debtor retained possession.

In *Watkins vs. Burch*, (4 *Taunton* 823,) the case was, the debtor confessed judgment to the plaintiff, who bought the goods at a sheriff's sale, and then lent them to the debtor, at a certain rent ; another creditor levied upon the same goods ; and the plaintiff brought trespass—and the court held, that the action well lay, and add " the letting the goods for " rent makes the case much stronger."  In *Barrow vs. Paxton*, (5 *Johnson* 258,) the plaintiff demised a house, and to secure the rent took a bill of sale of the household furniture, with a proviso, if the rent was paid as stipulated, the sale to be void.  The debtor continued in possession and sold the goods to the defendant.  The court held the sale to the plaintiff good, and said " possession continuing in the vendor " is only *prima facie* evidence of fraud, and may be explain- " ed."  The cases of *Beals vs. Guernsey*, 8 *John.* 446.—*Portland Bank vs. Stacy*, 4 *Mass. Rep.* 661.—*Paget et a. vs. Perchard et a.* 1 *Esp. N. P. C.* 204.—*Rob. on fraudulent con.* 546, and many other cases are to the same effect ; and all go to show, I apprehend, that fraud is a question of fact for the jury, depending upon no one fact, but to be inferred and deduced from all the facts, that may exist in any particular case. All the law upon this subject, and every case having a direct or remote bearing upon this question, are referred to in *Low vs. Haven*, 2 *N. H. Rep.* 13.  That case, from the circumstance, that it was decided recently in our own court, is the strongest, that can be imagined ; and I have not ingenuity to see, how it can be got over.  Although that was a case of mortgage, yet the whole subject was examined ; and I see no way to escape its authority, but to overrule it.  After much argument, and citing, and commenting upon many cases

to show, that fraud is a question of fact to be decided by the jury, and not by the court, the court say, " perhaps the only " exceptions are cases, in which special statutes declare, " that some act shall constitute fraud, or when a fraudulent " intent is inevitably inferable from some act, and both these " acts are admitted or proved. The act of possession, how- " ever, by the former owner, after a sale or mortgage, has " never been declared fraudulent by express statute, and it " is not an act, which, in its nature, inevitably indicates " fraud." And, in conclusion, the court say, " in fine, pos- " session of property being retained by the vendor, after a " sale, is not *per se* a fraud, but, in the language of *Lord* " *Mansfield*, being only evidence of fraud, may be explained. " The whole circumstances should be submitted to the jury, " and from all parts of the transaction taken together it should " be determined, whether the contract of sale was or was " not fraudulent in the concoction of it." No language could be stronger. This is not a mere *obiter dictum*, but a conclu- sion, drawn from a full examination of the very question now in controversy.

I am aware, that in several of the cases above cited, a distinction is made, when the bill of sale is absolute, and when it is otherwise—when the possession is consistent with the contract, and when it is not. In the former case, posses- session is not even *prima facie* evidence of fraud ; but when the sale purports to be absolute, and the vendor continues in possession, there it is admitted, that possession is evidence of fraud ; but not conclusive evidence. This seems, altogether, the most rational doctrine. The question in all these cases of supposed fraud is, what did the parties to the contract re- ally intend ? Did they intend to make a real, fair sale, and was payment truly and *bona fide* made, or was there a secret trust and confidence between the parties, and no sale actual- ly intended, but the property merely covered, and intended to be put out of the reach of creditors ? These are the true questions, to be settled in cases of this description ; and no one fact, admitted or proved, can show conclusively how the transaction was ; and proof of any other fact or circumstance, which the books mention as evidence of fraud, might as well

be held conclusive, as that of the vendor's continuing in possession.

But against the doctrine, for which I contend, supported as it is by a mass of authority, and, as I think, by sound sense, there are some two or three cases, which hold to a contrary doctrine. As the case in *Cranch*, and in 9 *Johns.* 339, were founded upon, and, if supported, must be supported by the case of *Edwards vs. Harben*, (2 *D. & E.* 594,) I will confine my remarks to that case. The error, which the court ran into, in the case last mentioned, happened, as I apprehend, from not distinguishing between the statutes of 13 *Eliz.* C. 5, and the 27 *Eliz.* called the statute of frauds, and which are in force in this state, and another statute 21 *Jac.* I. C. 19, which makes a part of the bankrupt system, and certainly is not in force here. *Roberts* on fraudulent conveyances, page 554, says, " the leading object of the statute of 13 *Eliz.* C. 5, was " to prevent those collusive transfers of the legal ownership, " which place the property of a man indebted, out of the " reach of his *bona fide* creditors, and leave to him the bene- " ficial enjoyment of that, which ought in conscience to be " open to their legal remedies." And, in the same clause it is added, " possession is only evidence of fraud under that " statute, by being a strong indication of a secret trust or " reservation." Immediately afterwards, in page 555, he adverts to the statute of 21 *James* I. and says, " as all cases " under the 21 *Jac.* turn upon the apparent ownership, and " the consequent injury to fair creditors, from the deception " thereby induced, the operation of that statute may be gen- " erally distinguished from that of 13 *Eliz.* by adverting to " that criterion ; for the conveyance and continuance in pos- " session operate, under the statute of *Eliz.* as an argument " of intentional fraud ; but the transaction falls within the " mischief of the statute 21 *Jac.* I. by affording an opportu- " nity of committing fraud, and by breaking through the legal " equality of the general creditors. All conditional sales of " goods, where the party conveying retains the possession, " are regarded as within the spirit of 21 *Jac.* I." It is obvi- ous, what were the different objects of the statutes of *Eliz.*

and *Jac.* The object of the first was to provide, that a debtor's property should not, by any pretended sale, be put out of the reach of his creditors. The object of the 21 *Jac.* was, that all a debtor's property should be liable equally, to pay all his debts. The debtor may not prefer one creditor to another—such is not the law of this state.

It is not surprising, that the English courts should have been led into this error, when we consider of how frequent occurrence are the cases of bankruptcy, and the zeal, with which they feel it their duty to carry into strict operation their statutes upon that subject. That it is to this error the decision, above alluded to, is to be traced, is rendered the more probable by the remark of the author last quoted, pages 559 and 564 ; he says, in reading the case of *Edwards vs. Harben*, it is difficult to preserve the mind from confusion as to the distinct principles of the statutes of 13 *Eliz. C.* 5, and 21 *Jac.* I. *C.* 19 ; and again, in noticing the case of *Kidd vs. Rawlinson,* he intimates pretty strongly, that it is not to be reconciled with the case of *Edwards vs. Harben.*

As to all purposes contemplated by the statute of *Eliz.* I do not see, why possession in the vendor should be conclusive evidence of fraud in any case, or why, in most cases, it should be evidence of it at all. We know, that in very many cases, upon any legal construction, possession is no test of ownership ; nor is it so considered by any prudent purchaser. The object of the statute was only to prevent property being placed beyond the reach of creditors, to discountenance pretended sales, and not to render void those, that were real.— When a specific article of property has paid a certain debt, the legitimate object has been effected ; the property has paid all it ought ; and other creditors have no claim, that the same property shall also pay their debts. Nor can it be of any consequence, where the property remains, after it has answered all the fair claim upon it, by being once appropriated to pay the debt of the debtor. Let a jury in all cases determine, from all the circumstances, whether the sale, attempted to be supported, is a real or pretended one. They would much oftener do justice, than to make the existence

of any one fact, conclusive evidence. A contrary doctrine is too chilling to that benevolence and humanity, which sometimes operates to place in the hands of an unfortunate friend, such articles, as are necessary to his comfort, and almost to his existence.

But beyond all this, even supposing I am altogether mistaken, in my views of the law, thus far, and admitting *Edwards vs. Harben*, to be law, I shall contend, and with much confidence, that the case under consideration is distinguishable from that case, and all others like it. I take it to be a well settled principle, " that a transaction good at the commence-" ment shall not become fraudulent by matter *ex post facto*." *Shep. Touch.* 65.—*Rob. on Fraud. Convey.* 559, *note*. What then was this transaction at its commencement? Was any fraud concocted in it? It is proved and admitted, in this case, that the goods were sold to *Delano*, at a fair price, and notes, which were the consideration of the sale, actually given up. Those notes, until the sale, were justly due. After the sale the goods were packed up to be moved. Although in the house of *Sampson*, the legal ownership being in *Delano*, and he there in the house, and with the goods, they were, to every intent, in his possession. Let us stop a moment, at this point of time, and see what were the legal rights of all concerned. Was not *Delano*, at this time, to every purpose the absolute owner of these goods? Suppose an attachment had then been made, on a writ against *Sampson*, will it be pretended, that they could have been holden? Certainly not. Up to this time, there is no pretence, that it had ever entered the mind of *Delano* to leave them with *Sampson*. All this was done in the forenoon. When *Delano* was about getting teams to remove the goods from the house, his humanity was assailed by the tears of *Mrs. Sampson*, and he was importuned to leave the goods on some terms. *Delano* then consulted counsel, to see if he could leave them with safety to himself, and not until the afternoon, several hours after the purchase, was the arrangement made to lease them to *Coburn* (or to *Sampson* if you please) nor was this a sham leasing : the stipulated rent was to be paid, and this was expected by all parties. It is not doubted, that *Delano* meant so to leave

the goods, as that they should not be liable for *Sampson's* debts. He did not intend, that the goods, he had bought and paid for, should pay other debts of *Sampson ;* and we contend, they ought not. It is true, the true motive, in leaving the goods, was to accommodate *Sampson's* family ; but he gave them nothing. He was to be paid a fair rent for the use of them.

If we are correct in supposing, that *Delano* owned the goods, after he had paid for them, and taken them into his possession, we cannot understand how he has lost his right to them ; nay, how his case differs from that of lending any other goods to *C.* or *S.* which *S.* had never owned. And herein this case differs from those, which are urged against us. In *Edwards vs. Harben,* it was a part of the contract of sale, that the goods should remain fourteen days with the vendor ; and yet the sale upon its face was absolute. Here then was the secret trust. The contract was not what it purported to be. It was not an absolute sale. The parties did not so intend— it was conditional in its creation and to be no sale, if a certain sum should be paid in a certain time. We contend, that the purchase of these goods makes one entire and distinct trans- action. The contract of sale was fully executed, and had its perfect effect to transfer the title to *Delano,* and the after agreement, to lease the goods, made no part of, and had no con- nexion with the contract of sale. It was as entirely distinct from it, as if *Delano* had carried the goods to Rhode Island, and a month after had leased them to *Coburn* or *Sampson.*— We think, the principle above applies precisely to our case. This transaction was good in its commencement, and cannot become fraudulent by matter *ex post facto.* If the transaction was all right till *Delano* became the owner of the goods, his title cannot be affected by leaving them at *Sampson's.* The doctrine, against which we contend, cannot, I apprehend, be carried so far as to say, that the vendor cannot, by virtue of a subsequent contract, have possession of the goods sold.— The idea, I have of this secret trust, the deadly poison, that destroys the contract, is, that it is an ingredient existing at the time, and mingled with the very contract of sale, and so

contaminating the sale, that it becomes inoperative and void. If it is not this, I do not understand what it is. Will it be said, that notwithstanding the facts are, as above stated, and were so distinctly proved, yet the jury were bound to presume the facts were otherwise? Must they presume, that the contract of sale and the leasing of the goods, were one and the same transaction, when the proof was, that they were distinct, and had no connexion? In this particular, with all deference, we apprehend, the court erred; and we are not entirely satisfied with the opinion intimated upon the general question, for the reason before stated. In the foregoing remarks, I may have alluded to some facts, not noticed in this case, as drawn up. They may be immaterial. The whole case is within the recollection of the court; and all we can ask, is a decision upon the facts admitted and proved on the trial.

*Kimball* and *Woodbury*, for the defendant.

RICHARDSON, C. J., delivered the opinion of the court.

In this case, the sale of the goods by *Sampson* to *Delano*, was absolute and unconditional, and was made upon a valuable and adequate consideration; and the only question at the trial was, whether it was made *bona fide*? It was admitted, that the goods were not removed, but were, by an agreement made immediately after the sale, left in the possession of *Sampson*, for his accommodation, and were, in fact, used by him, as before the sale. The court being of opinion, that such a sale could not, in law, be deemed *bona fide*, directed the jury to return a verdict for the defendant; and to this direction the plaintiff has taken several exceptions, which we shall now proceed to consider.

In the first place, it is objected, that the question, whether the sale was made *bona fide*, was a question of fact, to be settled by the jury, and not a question of law for the decision of the court. In order to render the question, involved in this objection, more intelligible, it may be useful to examine with attention, and ascertain with some precision, what absolute sales of goods are to be considered as made *bona fide*, and what *mala fide*, within the meaning of the rule, which requires all sales of goods, to be made *bona fide*, in order to

be valid as against creditors. A much broader view of the subject might be taken ; but, in the present case, it is not necessary to extend our enquiries beyond absolute sales.

A sale of goods, in order to be considered as made *bona fide* with respect to creditors, must be made without any trust whatever, either express, or implied. This is the doctrine of *Twyne's* case ; and we are not aware, that the soundness of it has ever been questioned. It is not permitted to a debtor to convey away his goods, by sale, with any secret understanding between him and the vendee, that the goods shall be holden for the benefit of the vendor, in any way, whatever. The nature of the benefit, reserved in the sale, is immaterial. It matters not, whether the benefit is to consist in the use of the goods, or in some other favor to be shown by the vendee. Any thing of this kind is a trust, and what the law denominates a fraud. " For that," says *Lord Coke*, " which " between the donor and donee, is called a trust *per nomen* " *speciosum*, is in truth, as to all creditors, a fraud." Nor are the grounds, on which this doctrine is founded, unsatisfactory. All conveyances, with secret reservations for the benefit of the vendor, tend directly to hinder and delay creditors. They hold out false colours and false appearances, and mislead and deceive creditors. They give to the property of the vendor, the appearance of belonging wholly to another, when, in truth, he has an interest in it, concealed under the trust. It is for this reason, that a trust, of this kind, is in law, a fraud. As the obvious tendency of these reservations and trusts is to deceive and defraud creditors, it has not been deemed necessary to stop to enquire into the particular views or motives of individuals, in each case ; but all courts, relying on the presumption, that every man intends the probable consequences of his acts, have at once pronounced all these trusts to be frauds, not only within the meaning of the 13 *Eliz.* C. 5, but at common law ; and have held, that sales without any trust whatever, and such sales alone, are to be considered as *bona fide* sales with respect to creditors.

The nature of a *bona fide* sale, may be further illustrated by an examination of the two species of trusts, mentioned by *Lord Coke* in *Twyne's* case. " Every trust," says he, " is

" either expressed or implied.   An express trust is, when in
" the gift or upon the gift, the trust by word or writing is
" expressed.   A trust implied is, when a man makes a gift
" without any consideration, or on a consideration of nature
" or blood only."   And to explain the nature of an implied
trust, he says, " when a man, being greatly indebted to sundry
" persons, makes a gift to his son, or any of his blood, without
" consideration, but only of nature ; the law intends a trust
" between them, that the donee would, in consideration of
" such gift being voluntarily and freely made to him, and
" also, in consideration of nature, relieve his father or cousin
" and not see him want, who had made such gift, to him."—
Thus it seems, that whenever a man in debt transfers his
property, without a valuable consideration, as such a transfer
tends to injure his creditors, the law presumes the trust, and
pronounces the transfer fraudulent.   No man is permitted to
give away his property to the injury of his creditors.   Every
such gift is a violation of good faith, and, in law, a fraud.   It
is not necessary, that fraud should have been actually inten-
ded.   The language of the law is, that no man shall be heard
to say, that he acted honestly, and with good faith, in giving
away property, which, in equity and good conscience, ought to
have gone to pay his just debts.

Express trusts may be created, not only by writing, or by
parol, but by a secret understanding between the parties,
when nothing is said or written on the subject.   But, in what-
ever way they may be created, their nature is the same.

Such being the nature of secret trusts, and of *bona fide*
sales ; we will now proceed to inquire, how far possession of
a chattel by the vendor, after a sale, is evidence of a trust.

After a most attentive and careful examination of the
books, on this subject, we have not been able to entertain a
doubt, that the true rule, to be deduced from all the ad-
judged cases, is, that when the sale is absolute, possession
and use of the goods, afterwards, by the vendor, is always
*prima facie*, and, if unexplained, conclusive evidence of a
trust.   *2 D. & E.* 587, *Edwards vs. Harben.*—3 *Coke* 80,
*Twyne's case.*—1 *Cranch* 309, *Hamilton vs. Russell.*—4 *Bin-
ney,* 258, *Dawes vs. Cope.*—3 *Cranch* 73, *the United States*

*vs. Hoe.*—1 *Taunt.* 381.—1 *Pick.* 295.—4 *Johns.* 337.—2 *Buls.* 225.—1 *Esp. N. P. C.* 205.—1 *Campb.* 332.

To this rule, it can hardly be said, that any exception is to be found in the books. For the cases of sales of ships at sea seem not to come within the spirit of the rule, until the vessels arrive in port ; and then the rule itself applies.— 4 *Mass. Rep.* 659, *Haines vs. Corliss.*—8 *do.* 287.—4 *do.* 661.

So cases of goods, bought at a sheriff's sale, and afterwards loaned to the execution debtor, have been held not to come within the rule. 2 *Bos. & Puller* 59, *Kidd vs. Rawlinson.*— 2 *L. Ray.* 724, *Cole vs. Davies.*—4 *Taunt.* 823.

And the case of *Steel vs. Brown & Parry,* (1 *Taunt.* 381,) where it was decided, that a bill of sale of goods, made for a valuable consideration, unaccompanied with possession, was valid as against the vendor, and as against a creditor, with whose knowledge it was made, is not within the rule ; because the assent of the creditor puts him on the ground of a party to the sale.

In no one of the cases, cited by the plaintiff's counsel, is there a decision not to be reconciled with this rule. *Cadogan vs. Kennet, Cowper,* 432, *and Haselinton vs. Gill,* 3 *D. & E.* 620, *note,* are cases of marriage settlements, and the decisions rest on grounds peculiar to that species of contract. In those cases, possession is perfectly consistent with a *bona fide* sale, and, of course, furnishes no evidence of fraud.

*Barrow vs. Paxton,* (5 *Johns.* 258,) was a case of mortgage, and not an absolute sale ; and the sale of the goods was questioned, by a subsequent purchaser, and not by a creditor.— The decision, in that case, does not, therefore, bear upon the point we are now considering.

In the case of *Beals vs. Guernsey,* (8 *Johns.* 446,) the general rule, which we have laid down, was admitted ; but an explanation of the possession, which the court deemed satisfactory, was given. That decision, therefore, is so far from being repugnant to the rule, that it is founded upon the rule.

*Haven vs. Low,* (2 *N. H. Rep.* 13,) was a case of mortgage ; and the decision is not directly in point. It was decided, that when the possession of goods mortgaged is retained by

the mortgager, that circumstance alone is not conclusive evidence of fraud. The decision was, therefore, in perfect accordance with the rule, we have laid down. For when the court say, that the possession of the goods is not conclusive evidence, all that is intended is, that it " may be rebutted " or explained."

We have no hesitation in saying, that there is no contradiction, in the decisions on this point. All the cases are reconciled by the distinctions we have stated. There may be some loose and inaccurate *dicta* of judges, in delivering opinions, which, if taken separately, aud understood in a broad sense, without any reference to the particular circumstances of the case, under consideration, may seem to be not easily reconciled with the rule ; but, in the decisions, it is most confidently believed, that no clashing is to be found.

But it is said, that all the decisions, from which we deduce this rule, are founded upon error and mistake, in confounding the statutes of 13 *Eliz. C.* 5, and the 21 *Jac.* I. *C.* 19. If there be an error of this sort, it is one, to which the maxim of *communis error facit jus* may be most happily applied ; for it seems to have been the error of all the English courts, and of all the courts in this country, whose attention can be ascertained to have been directed to the subject. There cannot, however, have been any such mistake. For *Twyne's* case, which, in substance, contains the rule we have laid down, and has ever since been considered and followed, as sound law, was decided more than half a century before the statute of 21 *Jac.* I. *C.* 19, was made.

And, independent of authority, the rule itself seems to us, to rest upon grounds the most satisfactory. An agreement to let a vendor retain the possession and use of goods, after an absolute sale, is not a common and ordinary thing in the course of business. It is, therefore, calculated to excite suspicions ; and it is the bounden duty of all courts, for the safety and protection of creditors, to call upon, and hold the vendee, in all such cases, to explain clearly and satisfactorily, how an absolute sale could have been *bona fide*, and yet the vendor retain the use and possession. Such a separation of the use

from the title to personal property, would afford a cover for innumerable frauds against creditors, if they were, by law, compelled to unravel each transaction, and shew actual fraud. It would rarely be in their power to do this, in the most fraudulent cases. All would be contrived, originally, by the parties to the fraud, to meet the attack ; and the fraud would be carefully covered, by fortresses, impregnable by any evidence, which it would be in the power of creditors, to bring against them. But, let the burthen of proof be thrown upon the vendee, in these cases, to show, that the sale was *bona fide*, if it really were so, he, being a party to the transaction, knows where the evidence is, and can easily show the fact ; and if it were not *bona fide*, the fraud can rarely escape detection.

It thus seems to us, to be settled, as firmly as any legal principle can be settled, that the fraud, which renders void the contract, in these cases, is a secret trust, accompanying the sale, and that, in cases of absolute sales, possession and use, by the vendor, after the sale, is always *prima facie*, and, if unexplained, conclusive evidence of a secret trust. It is, therefore, very clear, that fraud is sometimes a question of fact, and sometimes a question of law. When the question is, was there a secret trust ? it is a question of fact. But when the fact of a secret trust is admitted, or in any way established, the fraud is an inference of law, which a court is bound to pronounce. This is the doctrine of *Edwards vs. Harben*, 2 *D. & E.* 589,—is strongly recognised in *Sturtevant vs. Ballard*, 9 *Johns.* 339,—was laid down in *Stone vs. Grubham*, 2 *Buls.* 225,—was distinctly acknowledged to be law by the supreme court of the United States, 1 *Cranch* 318, and by the supreme court of Massachusetts, 1 *Pick.* 295, and of Pennsylvania, 4 *Binney*, 258.

Upon these principles, the question, we are now considering, is easily settled. It was admitted, that the sale of the goods by *Sampson* to *Delano* was absolute, and that *Sampson* retained the possession, and had the use of the goods, as before the sale. There was no question as to the facts. The question was, whether, upon these facts unexplained, the

sale could, in law, be deemed to have been made *bona fide*. The whole dispute turned upon a matter of law, and not of fact. And so with respect to the explanation, which the plaintiff gave of the transaction, and upon which he relied, as rebutting the presumption of a secret trust, arising from the possession and use of the goods, by the vendor, after the sale, the fact, that the agreement, as to the possession, was made after the sale was completed, was taken for granted; and the question was, whether, in law, it was sufficient to repel the presumption arising from the possession and use of the goods.

We are therefore of opinion, that there was no question of fact in dispute, between the parties, upon the trial, which could have been submitted to the jury, and that this exception must be overruled.

But, it is further excepted to the direction of the court, that the explanation given by the plaintiff was, in law, sufficient to repel the presumption, arising from the possession and use of the goods; and we will now proceed to examine this exception. The ground, which counsel take, is, that the original contract, not being fraudulent at the commencement, shall not become so by matter *ex post facto*. The principle may be conceded; but how does it apply in this case? *Lady Lambert's* case, which has been cited in *Shepherd's* touchstone, was a mortgage, and is said to have been made *bona fide*, and for a valuable consideration. In such a case, there could be no doubt, that the principle applied.— But, before that principle can be applied to this case, it must be shown, that the sale was *bona fide*, and not fraudulent at the commencement. Now it happens, that this is the very matter in controversy. The only dispute is, whether the sale can be considered as made *bona fide*; and, until that question is settled, the principle cannot be applied.

Another answer to this objection is, that there is a wide difference between a mortgage of land and chattels real, and mortgages of mere goods and moveables. In the one case, the title deeds are the proper documents to shew the title; and possession cannot mislead. But, in the case of personal

Coburn
*vs*
Pickering.

chattels, possession is the common evidence of title. In a mortgage of real estate, it is not, therefore, a badge of fraud, that possession does not follow the deed. *Rob. on Fraud. Con.* 556. In that case, we may safely apply the principle, that if the transaction be not fraudulent at the commencement, it shall not become so by matter *ex post facto.*

But, in relation to sales and mortgages of personal property, different rules are adopted in this respect. In order to increase the difficulties of fraud, courts have thought it expedient to require certain signs of good faith. which cannot be reconciled with fraudulent purposes. One of these signs is, that possession shall accompany and follow the sale of personal chattels. There has been a constant exertion, by individuals, to evade this rule, and to separate the possession and use of goods, in these cases, from the title, in such a manner as to render the transaction apparently *bona fide.* But, from the days of *Queen Elizabeth*, to this hour, those exertions have been met and resisted by all courts, where the common law is known and respected, with all the firmness and uniformity, which the importance of the rule has demanded.— No rule could have been devised. better calculated to check fraud. Nothing has been found so embarrasing to those, who have been disposed to act without good faith. As soon as it was settled, that not the original contract alone, but the whole transaction and its tendencies, were to be considered, and a judgment of the original intention formed, not from evidence of actual intention, but from the subsequent conduct of the parties; it gave the creditors the means of detecting fraud. And, when to this was added the rule, that possession and use, by the vendor, should, if unexplained, be conclusive evidence of fraud, it threw the burthen of proof upon the parties to the sale, to clear it from suspicion, and it became, in the highest degree, difficult to escape detection in a fraudulent transaction. These rules have been in constant use for more than two centuries; and experience has given an ample illustration of the wisdom, with which they were devised, and of the efficacy, with which they may be applied. But the principle, for which the learned counsel of the plaintiff has

contended, that the original contract is to form the criterion, by which the honesty of the sale is to be determined, stands in direct opposition to these rules. Nor is this all. It stands wholly unsupported by authority, and seems to have made its appearance for the first time, in this case. To give it any countenance in our courts, would, in our judgment, take from creditors some of the most efficient means of detecting fraud, which human ingenuity has been able to invent. We therefore think, that the objection must be overruled.

One other circumstance has been mentioned, as sufficient to clear this case from all suspicion of fraud; and that is, that a rent for the use of the goods was agreed to be paid: and the case of *Watkins vs. Burch*, (4 *Taunt.* 823,) seems to have been cited in support of this proposition. But, as we have before remarked, that was a case of a sale by the sheriff, and the actual payment of rent was thought to strengthen the evidence of the fairness of the transaction; because such payment was not likely to have followed a collusive purchase. But, in a case, like the present, of an absolute sale by the owner of the goods himself, to his debtor, an agreement by the vender, to pay rent for the goods, is not only not inconsistent with that species of trust, which the law deems a fraud, but may, in fact, constitute a part of the agreement, on which such a trust arises. That case is also distinguishable from this, in a very important particular. There the rent was actually paid. Here there was nothing but an agreement to pay.

We have now considered all the exceptions, which have been taken in this case. We have examined them with the utmost attention, not so much because we deemed the law to be doubtful or obscure, as because such an examination seemed to be due from us, to the very able and ingenious argument of the plaintiff's learned counsel. And after the best consideration, we have been able to give to the subject, we have no hesitation in saying, that the grounds, on which the plaintiff has rested his motion for a new trial, are, in our judgment, insufficient to sustain it, and that the defendant is legally entitled to                         *Judgment on the verdict.*